**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELA FARVE, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| RIVER LIGHT V, L.P. and TORY BURCH, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Angela Farve brings this action on behalf of herself, and all others similarly situated (the "Class Members"), against Defendants River Light V, L.P. and Tory Burch, LLC, ("Defendants" or "Tory Burch").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all U.S. residents who accessed and navigated www.toryburch.com (the "Website") and whose electronic communications were intercepted or recorded by advertising technology provided by TikTok Ltd. ("TikTok") and Google, LLC ("Google") (collectively the "Third Parties").

2.    Defendants are an "American luxury lifestyle brand founded in New York in 2004. What began with a boutique in Manhattan and an e-commerce site has since grown into a global business." [1]  Defendants sell and market their products through the Website.

3.    When consumers visit the Website, they are presented with the opportunity to opt out of third-party tracking technologies including those which Defendants use for targeted advertising and website performance purposes.

4.    Unbeknownst to their customers, and contrary to their express assurance that customers have control over the sale and sharing of their personal information, Defendants intercept and disclose their customers personally identifiable information ("PII"), and product purchase information to unknown third parties—including, but not limited to, TikTok and Google—even when customers affirmatively disable the tracking technologies.

5.    Despite their promises and representations of privacy, Defendants aid, agree with, employ, or otherwise enable third parties, including TikTok and Google, to eavesdrop on communications sent and received by Plaintiff and Class Members on the Website that Defendants own and operate, including communications that contain personally identifiable information ("PII").  By failing to procure consent before enabling TikTok and Google to intercept these

---

[1] TORY BURCH, *About Us*, https://www.linkedin.com/company/tory-burch.

communications, Defendants violated the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. §2511, *et seq.*), the California Invasion of Privacy Act ("CIPA") § 631–32, 638.51; and the California Constitution.

## PARTIES

*Plaintiff*

6.      Plaintiff Angela Farve is a resident and citizen of San Francisco, California.  At all relevant times, Plaintiff maintained active accounts with TikTok and Google.  When creating her TikTok and Google accounts, Plaintiff provided TikTok and Google with her PII, including her full name, date of birth, phone number, and email address.  Plaintiff was in California when she visited the Website.  Plaintiff used the same device to access the Website that she did to access her TikTok and Google accounts.

7.      On or around November 2023, Plaintiff accessed Defendants' Website—while in California—and made a purchase. Despite Defendants' representations of confidentiality, Plaintiff's communications during this visit were intercepted and disclosed to TikTok and Google through the tracking technologies, including communications that contained Plaintiff's PII and information about her purchases.  Neither Defendants nor TikTok and Google procured Plaintiff's consent prior to these interceptions, nor was Plaintiff on notice of the fact that such interceptions were occurring—in fact, Defendants expressly warranted they didn't share directly personal information.  Such disclosures are a violation of Plaintiff's privacy and were done intentionally for targeting advertising purposes.

*Defendants*

8.      Defendant River Light V, L.P. is a Delaware limited partnership, headquartered in New York.  Defendant River Light V, L.P. and Defendant Tory Burch, LLC own and operate the Website.

9.      Defendant Tory Burch, LLC Delaware limited liability company, headquartered in Albany, New York.  Defendant River Light V, L.P. and Defendant Tory Burch, LLC own and operate the Website.

10. Defendants knowingly and intentionally incorporated a host of tracking technology for marketing, advertising, and analytics purposes on the Website without disclosure to its users, including tracking technologies provided by TikTok and Google.

11. Defendants chose to embed the tracking codes from TikTok and Google into the Website (collectively the "Tracking Technologies"), whereby it disclosed the confidential and protected PII of its users with TikTok and Google for targeted advertising purposes. Defendants configured the Tracking Technologies such that even if a customer rejected their use, TikTok and Google could still utilize their data for targeted advertising purposes. Defendants did this without authorization or consent from its users. Had Defendants complied with the law, they would not have benefited from the information and marketing services they received from the Third Parties.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from Defendants.

13. This Court has personal jurisdiction over this matter because Defendants purposefully direct their business activities in this District by offering their products to residents of this District. Further, Plaintiff was residing in this District when she accessed the Website and had the Tracking Technologies installed on her device, which Defendants knew would cause harm throughout California, including within this District.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants do substantial business in this District, a substantial part of the events giving rise to the claim occurred in this District, and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

**A.    Defendants' Website and Privacy Representations**

15.    Defendants own and operate the Website.  Unbeknownst to customers, Defendants integrate the Tracking Technologies from TikTok and Google into the Website.

16.    Through the Website, Defendants promise customers that it will keep their personally identifiable electronic communications confidential.

17.    When a customer first accesses the Website, Defendants allow their users to manage their cookie preferences.

18.    Defendant explicitly warrants their targeting cookies, when accepted, "do not store directly personal information."  *See* Fig. 1.



— Opt Out of Third-Party Targeting Cookies

These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant advertisements on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising. **To opt out of receiving targeting cookies on our website, click the toggle button above so that it turns grey. Be sure to click the "Confirm My Choices" button at the bottom to save your preferences. To effectively manage cookies via this cookie settings tool, you must set cookie preferences on all browsers and all devices that you use. If the toggle button is currently grey, you have previously opted out of receiving targeted cookies.** If you clear the cookies on your device, you may need to set your cookie preferences again.

19.    Despite Defendants' claims they do not disclose consumers' directly personal information, Defendants enable third parties, including TikTok and Google, to track consumers'—including Plaintiff's—Website browsing activities and eavesdrop on users' private communications on the Website.

20.    As courts across the country have recognized, the identifiers that the Tracking Technologies capture—names, email address, phone number, and social media IDs—constitute "directly personal information."  *See supra*-Fig. 1.  By capturing this information, contrary to its explicit representation not to, Defendants fail to receive consent from customers to intercept their communications.

21.    Despite clear promises not to, Defendants intercept and disclose personally identifiable communications to TikTok and Google regarding consumers' activity on their Website.

**B.    Consumers Have A Financial Stake In Companies' Promises Relating To Their Data Privacy**

22.    "In an era where every click, tap or keystroke leaves a digital trail, Americans remain uneasy and uncertain about their personal data and feel they have little control over how it's used."[2]

23.    "The value of consumer data often comes from identifying users and combining their data from various sources.  This is possible, in part, through the ubiquity of personally identifiable information (PII) and unique identifiers, as well as identifying individuals from non-PII, such as aggregated or anonymized data.  The ability to identify users enables website and app operators to combine data and track user activity across devices."[3]

24.    "Advertisers, as well as website and app operators, have incentives to improve their ad targeting by collecting detailed information about each user.  Advertisers expect more precise targeting to increase sales.  Websites' revenue may depend on how frequently users click on the ad or how much time users spend viewing the ad."[4]

25.    For retailers—like Defendants—the ability to compile consumer patterns into algorithms improves how precisely they can sell to those same consumers.[5]

26.    With increased surveillance of consumers' purchase patterns, consumer concern over the control of their data privacy has continued to grow:

- "86% of Americans are more concerned about their privacy and data security than the state of the U.S. economy – but two-thirds either don't know or are misinformed about how their data is being used and who has access to their

---

[2] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER (October 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[3] CLARE Y. CHO & LING ZHU, CONG. RSCH. SERV., R47298, *Online Consumer Data Collection and Data Privacy*, (October 31, 2022), https://www.congress.gov/crs-product/R47298.

[4] Clare Y. Cho, CONG. RSCH. SERV., IF11448, *How Consumer Data Affects Competition Through Digital Advertising*, (January 26, 2023), https://www.congress.gov/crs-product/IF11448.

[5] Charles Duhigg, *How Companies Learn Your Secrets*, N.Y. TIMES, Feb. 16, 2012, https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html (example of how Target used consumer characteristics to identify and market to pregnant women).

privacy"[6]

- "67% of respondents don't understand what data privacy means or how their data is being used"[7]
- The public increasingly says they don't understand what companies are doing with their data. Some 67% say they understand little to nothing about what companies are doing with their personal data, up from 59%[8]
- 72% of Americans say there should be more [government] regulation than there is now; just 7% say there should be less. [9]
- Roughly four-in-ten Americans say they are *very* worried about companies selling their information to others without them knowing (42%) or people stealing their identity or personal information (38%).[10]
- 81% say they feel very or somewhat concerned with how companies use the data they collect about them. [11]
- People don't feel in control: Roughly three-quarters or more feel they have very little or no control over the data collected about them by companies (73%)[12]
- 36% strongly agree or somewhat agree they're in control of personal data. A third (29%) were concerned about how retailers and e-commerce companies use consumer data.[13]
- An overwhelming majority (85%) of consumers are taking at least one step to address their privacy and security concerns. However, 75% feel they should be doing more, and many indicate they feel a sense of powerlessness: They believe that companies can track them no matter what they do (26%), don't know what actions they can take (25%), and think hackers can access their data no matter what they do (21%).[14]

27.    This concern over data privacy also impacts consumer purchase behavior:

[6] Gary Drenik, *Data Privacy Tops Concerns For Americans – Who Is Responsible For Better Data Protections?*, FORBES, (Dec. 8, 2023) https://www.forbes.com/sites/garydrenik/2023/12/08/data-privacy-tops-concerns-for-americans--who-is-responsible-for-better-data-protections/.

[7] *Id.*

[8] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[9] *Id.*

[10] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *Views of data privacy risks, personal data and digital privacy laws*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[11] *Id.*

[12] *Id.*

[13] *Survey Shows Consumers Concerned About Personal Data, Privacy and Internet Safety for Children,* KINETIC, (Jan. 24, 2025) https://www.windstream.com/blog/consumer-data-privacy-survey-2025.

[14] *New Deloitte Survey: Increasing Consumer Privacy and Security Concerns in the Generative AI Era*, DELOITTE, (Dec. 2, 2024) https://www.deloitte.com/us/en/about/press-room/increasing-consumer-privacy-and-security-concerns-in-the-generative-ai-era.html.

- 79% of Americans are concerned about how companies use their data.[15]
- 75% of Americans believe there should be more regulations to protect their privacy from companies collecting consumer data without their consent or knowledge.[16]
- 60% of users say they would spend more money with a brand they trust to handle their personal data responsibly.[17]
- 52% of American users chose not to use a product or service due to worries about how much personal data would be collected about them.[18]
- 48% of users have stopped buying from a company over privacy concerns.[19]
- 33% of users have terminated relationships with companies over data. They left social media companies, ISPs, retailers, credit card providers, and banks or financial institutions.[20]
- 81% of users say the potential risks they face from companies collecting data outweigh the benefits[21]

28.    Consumer concerns over their privacy have been addressed at both the state and federal levels by the California Legislature and the Federal Trade Commission.

---

[15] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[16] Branka Vuleta, *18 Chilling Privacy Statistics in 2023*, LEGALJOBS (Jul. 22, 2025) https://legaljobs.io/blog/privacy-statistics.

[17] *Global Consumer State of Mind Report 2021,* TRUATA, https://www.truata.com/resources/report/global-consumer-state-of-mind-report-2021/.

[18] Andrew Perrin, *Half of Americans have decided not to use a product or service because of privacy concerns*, PEW RESEARCH CENTER, (Apr. 14, 2020) https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/.

[19] Ratnesh Pandey, *Staying Cyber-Secure While Working From Home*, TABLEAU, (updated Jul. 18, 2024) https://public.tableau.com/app/profile/ratnesh2928/viz/Stayingcyber-securewhileworkingfromhome/Stayingcyber-securewhileworkingfromhome/.

[20] *Consumer Privacy Survey*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-cybersecurity-series-2021-cps.pdf.

[21] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

---

### C.    The Federal Trade Commission and California Legislature's Protection of Consumer Data

29.    The Federal Trade Commission has taken action "against dozens of companies that claimed to safeguard the privacy or security of users' information, but didn't live up to their promises in the day-to-day operation of their business."[22]

30.    Notably, the Federal Trade Commission seeks enforcement against companies who violate their representations about safeguarding consumer information:

> When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up these promises.  The FTC has brought legal actions against organizations that have violated consumers' privacy rights, or misled them by failing to maintain security for sensitive consumer information, or caused substantial consumer injury.  In many of these cases, the FTC has charged the defendants with violating Section 5 of the FTC Act, which bars unfair and deceptive acts and practices in or affecting commerce.  In addition to the FTC Act, the agency also enforces other federal laws relating to consumers' privacy and security.[23]

31.    At the state level, the California Legislature is at the forefront of protecting citizens' privacy.  Take, for example, the California Online Privacy Protection Act, requiring companies to "conspicuously post [their] privacy policy" and "[d]isclose whether other parties may collect personally identifiable about an individual consumer's online activities over time and across different Web sites when a consumer uses the operator's Web site or service."[24]  This statute also defines "personally identifiable information ("PII")" as "[a] first and last name," "[a] home or other physical address," "[a]n e-mail address," "[a] telephone number," and "[a]ny other identifier that permits the physical or online contacting of a specific individual."[25]

32.    The California Legislature also enacted the California Consumer Privacy Act (the "CCPA"), requiring companies to post privacy notices that disclose "[t]he categories of personal information to be collected and . . . whether that information is sold or shared" Cal. Civ. Code §

---

[22] *Marketing Your Mobile App: Get It Right from the Start,* FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/marketing-your-mobile-app-get-it-right-start.

[23] *Privacy and Security* Enforcement, FEDERAL TRADE COMMISSION, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement.

[24] Cal. Bus. & Prof. Code § 22575(a).

[25] Cal. Bus. & Prof. Code § 22575(a).

1798.100(1).  The CCPA also makes clear that "[a] business shall not . . . use person information collected for additional purposes that are incompatible with the disclosed purpose for which the personal information was collected without providing the consumer with notice consistent with this section." *Id.*

**D.    Overview of the California Invasion of Privacy Act and the Federal Wiretap Act**

33.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

34.    The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*."  *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

35.    Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

36.    As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct."  *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978).  Specifically, CIPA § 631(a) prohibits any person or entity from:

(i)    "intentionally tap[ping], or mak[ing] any unauthorized connection . . . with any telegraph or telephone wire";

(ii)    "willfully and without the consent of all parties to the communication . . . read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or

(iii)    "us[ing], or attempt[ing] to use . . . any information so obtained."

37.    CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

38.    CIPA also outlaws "us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication." Cal. Penal Code § 632. The term "confidential communications" means "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes . . . circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal Code § 632(c).

39.    Also relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

40.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

41.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

42.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

43.    Historically, law enforcement used "pen registers" to record the numbers of

outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that telephone line.  As technology advanced, however, courts have expanded the application of these surveillance devices to Internet tracking technology.

44.    For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information.  On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

45.    Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme."  *In re Google Inc.* 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).  Thus, courts have found that internet tracking technology like those here fall under the purview of CIPA § 638.51.  *See, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3–4  (N.D. Cal. Dec. 12, 2024) (same); *Lesh v. Cable News Network, Inc.,* 767 F. Supp. 3d 33, 40–42 (S.D.N.Y. 2025) (same); *Moody v. C2 Educ. Sys. Inc.,* 742 F. Supp. 3d 1072, 1077 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51"); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050  (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1  (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications").

46.    This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection."  *Matera v. Google Inc.* 2016 WL 8200619, at *19 (N.D.

Cal. Aug. 12, 2016).

47.   Individuals may bring an action against a violator of CIPA § 631, 632, and 638.51 for $5,000 per violation.  Cal. Penal Code § 637.2.

48.   In a manner similar to CIPA, the Federal Wiretap Act (i.e. the ECPA) creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[26]

49.   Although the ECPA does not apply "where one parties to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[27]

### E.   Function of the Tracking Technologies

50.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

51.   Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

52.   Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- HTTP Request: an electronic communication sent from a device's browser to the website's server.  GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from devices to the host server.  Some cookies are "third-party cookies,"

---

[26] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

[27] 18 U.S.C. § 2511(d)

which means they can store and communicate data when visiting one website to an entirely different website.

- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

53. A consumers' HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

54. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

55. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The advertising technology provided by TikTok and Google, embedded on the Website by Defendants, constitutes Source Code.

56. When the web browser sends data transmission to third parties, the third parties are able to read or learn the contents of such communications while they are in transit.

**F.    TikTok's Tracking Technologies**

57. TikTok offers a SaaS called the TikTok Pixel, which helps businesses track the performance of their ads by sending information from the business's website to TikTok, who then uses that information to optimize ad campaigns on TikTok and across the internet.[28]

58. The TikTok pixel can be "plugged in" to any website, as the pixel is a piece of code that can be added to any website to capture "events" (any activity by a user that happens on a website).

59. The TikTok Pixel is part of a package of prebuilt software tools under the "TikTok for Business" product line that allow the delivery of personalized ads. By employing TikTok to

---

[28] "TikTok Pixel 101: What It Is & How to Use It," https://popupsmart.com/blog/tiktok-pixel.

collect user information through the TikTok Pixel, websites that procure TikTok's services can use the information to deliver more effective targeted advertisements, increasing revenue for the websites.

60.    In short, when users interact with a webpage with the TikTok Pixel installed, the TikTok Pixel collects the "Metadata and button clicks" (information about what the user clicked on—such as the specific URL address visited by the user— or text entered into the webpage), a timestamp for the event, and the visitor's IP address.[29]  That information is sent automatically to TikTok.

61.    The "TikTok for Business" business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the TikTok Pixel.

62.    Thus, through websites that employ TikTok's services, TikTok directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

63.    On each page on Defendants' Website that a user visits (where the TikTok Pixel is installed), TikTok collects the URL value of the page visited, an identification code TikTok uses to track the user, and the visitor's browser type and operating system.

64.    When the TikTok Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the TikTok Pixel involves TikTok, a separate and distinct third-party entity from the parties in the conversation, using the TikTok Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because TikTok itself is collecting the content of any conversation.  That information is then analyzed by TikTok before being provided to any entity that was a party to the conversation (like Defendants).

65.    Once TikTok intercepts website communications, it has the capability to use such information for its own purposes.  TikTok's Commercial Terms of Service grant TikTok "a non-

[29] *About TikTok Pixel*, TikTok Business Help Center (Mar. 2025) https://ads.tiktok.com/help/article/tiktok-pixel?redirected=2).

exclusive, royalty-free, worldwide, transferable, sublicensable license to access, use, host, cache, store, display, publish, distribute, modify and adapt [information collected from partner websites] in order to develop, research, provide, promote, and improve TikTok's products and services."[30]

66.    In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that TikTok can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing TikTok to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new TikTok Business products and services, or improve pre-existing TikTok Business products and services.

67.    TikTok partners with Defendants.  The TikTok Pixel is employed on the Website in the manner described throughout this Complaint.

**G.    Google's Tracking Technologies**

68.    Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars.  Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

69.    Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising." [31]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year.  Google generated an even higher percentage of its total revenues from advertising in prior years:

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

---

[30] *TikTok For Business Commercial Terms Of Service*, TIKTOK FOR BUSINESS, https://ads.tiktok.com/i18n/official/ policy/commercial-terms-of-service.

[31] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

70.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

71.     One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

72.     Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices." [32]

73.     In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

74.     Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet.  Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

---

[32] *About the User-ID feature*, GOOGLE,
https://support.google.com/analytics/answer/3123662#zippy=%2Cin-this-article.

75.     Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms." [33]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports." [34]

76.     Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when users are logged into their account portals.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or users) is using to access a website.  The device information intercepted by Google includes the user's operating system, operating system version, browser, language, and screen resolution.

77.     In other words, when interacting with the Website, an HTTP Request is sent to Defendants' server, and that server sends an HTTP Response including the Markup that displays the website visible to the user and Source Code, including Google's tracking technologies.

78.     Thus, Defendants are essentially handing their users a tapped device, and once the Webpage is loaded onto the users' browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for the Defendants and transmits those communications to Google.

79.     Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google for processing.  Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters.  Once the data is processed, it is stored on a Google database and cannot be changed.

---

[33] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.
[34] *Id.*

80.     After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (*e.g.*, information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (*e.g.*, measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (*e.g.*, classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

81.     In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

82.     The Website utilizes Google's pixel and SDK.  As a result, Google intercepted users' interactions on the Website, including their PII.  Google received at least "Custom Events" and URLs that disclosed the products purchased by the user.  Google also received additional PII, including but not limited to the users' IP address, device information, and User-IDs by matching IP addresses, device information, and User-IDs it intercepts and linking such information to an individual's specific identity.

83.     For example, the Website utilizes Google's "cid" or "Client ID" function to identify users as they navigate the Website.

84.     Similarly, Google also utilizes the "auid" or "Advertiser User ID," and "guid" or "Globally Unique Identifier," cookies which identify unique users and unique interactions with a website Defendant sent these identifiers with each consumer's "event" data.

85.     In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

86.     These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked, and can provide a wide variety of data.

87.     As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites." [35]

88.     The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

89.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[36]

90.     Browser-fingerprints are personal identifiers.  Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

91.     As enabled by Defendants, Google collects vast quantities of consumer data through its tracking technology.

92.     Due to the vast network of consumer information held by Google, matches the IP addresses, device information, User-IDs, and hashed versions of its account holders phone numbers and email addresses it intercepts and links such information to an individual's specific identity.

93.     Google then utilizes such information for its own purposes, such as targeted advertising.

94.     Google Analytics also links with Google Ads, allowing the data intercepted through Google Analytics to be utilized for targeted advertising purposes.[37]  Such practices were in effect on the Website for targeted advertising purposes.

---

[35]Justin Schuh, *Building A More Private Web*, GOOGLE,  https://blog.google/products-and-platforms/products/chrome/building-a-more-private-web/.

[36] *New reliable technique to track web users across browsers*, SCIENCEDAILY, https://www.sciencedaily.com/releases/2017/02/170213131447.htm.

[37] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article.

95.    The DoubleClick API "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."

96.    DoubleClick was acquired by Google in 2008.  In 2018, the DoubleClick API was integrated with the Google Analytics API into the Google Marketing Platform.[38]  The Google Marketing Platform makes use of most of DoubleClick's features, albeit under different brand names: for example, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."[39]

97.    As relevant here, however, data is still sent from the Website to Google through the DoubleClick API, and app developers like Defendants can then use the Google Marketing Platform to manage the data.

98.    Once integrated into a developer's mobile application, the DoubleClick API allows an app developer to, among other features, analyze and optimize marketing campaigns and conduct targeted advertising. [40]

99.    Once Defendants intercept the Website communications through the DoubleClick API and disclose such information to Google (in real time), Google has the capability to use such information for its own purposes.  "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps." [41]

100.    For example, Google utilizes the "auid" or "Advertiser User ID" cookies which identify unique users and unique interactions with a website.

101.    Google also encodes the user's email address, to later match it to its own records.

---

[38] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING PLATFORM (June 27, 2018), https://www.blog.google/products/marketingplatform/360/introducing-google-marketing-platform/.

[39] *Introducing Google Marketing Platform*, GOOGLE, https://support.google.com/displayvideo/answer/9015629?hl=en.

[40] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482.

[41] *Privacy and Terms*, GOOGLE, https://policies.google.com/technologies/partner-sites.

102. Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits. This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

103. Information from websites, like Defendants' Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

104. In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

105. Google views and processes every piece of information collected from the DoubleClick API, including the information collected from Defendants' Website, and uses it to assist with data analytics, marketing, and targeted advertising.

106. Google partners with Defendants in its marketing efforts. Google's tracking technologies, including Google Analytics, browser fingerprinting, and Google DoubleClick are employed on the Website in the manner described throughout this Complaint.

107. Plaintiff did not consent to the interception or disclosure of her data to Google. Defendants' disclosure, and Google's interception, of Plaintiff's and prospective class members' PII without their consent is an invasion of privacy and violates several laws, including the ECPA (18 U.S.C. §2511, *et seq.*); CIPA §§ 631–32, 638.51; and the California Constitution.

**H.    Defendants' Use of the Tracking Technologies**

108. Pursuant to agreements with TikTok and Google, Defendants intentionally and voluntarily embedded the Tracking Technologies on the Website. As illustrated within this section, Defendants unlawfully intercepted and disclosed personally identifiable information to TikTok and Google through Tracking Technologies, without customers' consent, contrary to its express warranties.

109. Plaintiff used the Website in the manner described herein.

110. The Tracking Technologies are Source Code that do just that—they surreptitiously

transmit a Website User's communications and inputs to the corresponding user IDs, much like a traditional wiretap.

111. For example, when individuals visit Defendants' Website via an HTTP request to Defendants' server, Defendants' server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Tracking Technologies).

112. Thus, Defendants are, in essence, handing customers a tapped website and, once a webpage is loaded into the customer's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept those communications—intended only for Defendants—and instantaneously transmit those communications to TikTok and Google.

113. Third parties—including TikTok and Google—offer companies, including Defendants, snippets of code they can install in web browsers of users logged into their services. These code snippets uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information intercepted (in this case, confidential PII and purchase information).

114. Defendants intentionally configured the Tracking Technologies installed on the Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, _ttp cookie, User-IDs, cookie identifiers, device identifiers, and hashed emails) and the "content" of these communications (the buttons, links, pages, and tabs they click, and view related to the shopping and products sought from Defendants).

115. Defendants install these Tracking Technologies despite understanding that their customers reasonably anticipate their identifiable information to be kept confidential and undisclosed to TikTok and Google. This installation contradicts Defendants' promise to keep PII confidential. *See*, *supra*, Fig. 1.

116. Contrary to their promise, as soon as consumers enter Defendants' Website, Defendants begin tracking and disclosing their interactions with the Website to TikTok and Google.

117.    When users access the Website, Defendants disclose the product details, URLs, and page titles of every page that they visit, including during the checkout process.  The URLs and page titles disclose what type of product the user is seeking to purchase.  For example, when a consumer clicks on a product, the URL of the page for that product, which includes information about the product is shared, is shared with TikTok and Google as enabled by Defendants.  TikTok and Google also receive information when the consumer adds the product to their cart before checkout.  *See, e.g.*, Figs. 2–6.

```
"action": "Click",
"auto_collected_properties": {
    "page_trigger": "Click",
    "trigger_element": {
        "tag": "BUTTON",
        "attributes": {
            "class": "button-ee4 button--dark-SRvbutton--medium-dL5",
            "type": "submit"
        },
        "inner_text": "ADD TO BAG",
```

**Figure 2: (Product Details - TikTok)**

```
},
"properties": {
    "gtm_version": "0_2_01:03",
    "event_trigger_source": "GoogleTagManagerClient",
    "contents": [{
        "content_id": "183522",
        "content_type": "product_group",
        "content_name": "small charlie croc-embossed shoulder bag",
        "content_category": "handbags-shoulder-bags",
        "price": 495,
        "quantity": 1,
        "brand": "Tory Burch"
    }],
    "currency": "USD",
    "value": 495
},
```

**Figure 3: (Product Details - TikTok)**

| | |
|---|---|
| guid | ON |
| async | 1 |
| en | form_submit |
| gtm | 45be65q0v890470410za20gzb812878794zd810260312xec |
| gcd | 13t3t3t3t5l1 |
| dma | 0 |
| tag_exp | 0~115938465~115938468~116701382~118131809~119034492~119169249 |
| u_w | 2560 |
| u_h | 1440 |
| url | https%3A%2F%2Fwww.toryburch.com%2Fen-us%2Fshoes%2Fsandals%2Fmiller-jelly%2F184868.html%3Fcolor%3D235%26size%3D6 |
| ref | https%3A%2F%2Fwww.google.com%2F |
| rcb | 12 |
| frm | 0 |
| tiba | Miller%20Jelly%20Sandal%3A%20Women%27s%20Designer%20Sandals%20%7C%20Tory%20Burch |
| ae | a |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| auid | 907267420.1779910104 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium%3B148.0.7778.179%7CGoogle%2520Chrome%3B148.0.7778.179%7CNot%252FA)Brand%3B99.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| _tu | CA |
| data | event%3Dform_submit |
| rfmt | 3 |
| fmt | 3 |
| is_vtc | 1 |

**Figure 4: (Product Details - Google)**

```
"ad": {
    "sdk_env": "external",
    "jsb_status": 2
},
"device": {
    "platform": "pc"
},
"user": {
    "auto_email": "5d9c2add395071ecef2848b9e7dcdea99be8d3c657cfc4627b93422f0b62ad40"
},
"pixel": {
    "code": "C38FQ4J521OIKNSF0KJ0",
    "runtime": "1"
},
```

**Figure 5: (PII - TikTok)**

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    24

| gtm | 45be65q0v890109664za20gzb812878794zd810260312xec |
|---|---|
| gcs | G111 |
| gcd | 13t3t3t3t5l1 |
| dma | 0 |
| tag_exp | 0~115616986~115938465~115938469~116701382~118131809~119169249 |
| gclaw_src | 0_1 |
| rcb | 2 |
| npa | 0 |
| frm | 0 |
| ae | a |
| gclgs | 1 |
| gclst | 110707 |
| gcllp | 142612656 |
| gclaw | CjwKCAjwrNrQBhBjEiwAoR4VOxk6kLTMTcp7wEvVX0CuXHaMcn0VWRZJLpd7RqjG42hJlKQdpRWXhhoCDjsQAvD_BwE |
| pscdl | noapi |
| auid | 907267420.1779910104 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium%3B148.0.7778.179%7CGoogle%2520Chrome%3B148.0.7778.179%7CNot%252FA)Brand%3B99.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| ec_mode | a |
| _tu | CA |
| em | tv.1~em.XZwq3TlQcezvKEi559zeqZvo08ZXz8Rie5NCLwtirUA |
| ecsid | 41526978.1779910202 |

**Figure 6: (PII - Google)**

118.    Even when users reject all cookies on the Website, the TikTok and Google Tracking Technologies are still active and continue to associate user activity with hashed emails and the _ttp cookie, as well as the Google encode email (the tv.1~em. Value)

119.    TikTok and Google receive the information described in this section irrespective of whether the user has a TikTok or Google account.

**I.    Defendants Did Not Anonymize Consumer Data By Disclosing "Hashed" Values To TikTok and Google**

120.    The Federal Trade Commission routinely evaluates privacy representations by companies.  When it comes to hashing the FTC has said the following:

> Companies often claim and act as if data that lacks clearly identifying information is anonymous, but data is only anonymous when it can never be associated back to a person.  If data can be used to uniquely identify or target a user, it can still cause that person harm.

> One way that companies obscure personal data is through "hashing." Hashing involves taking a piece of data—like an email address, a phone number, or a user ID—and using math to turn it into a number (called a hash) in a consistent way: the same input data will always create the same hash.

. . .

> This logic is as old as it is flawed – hashes aren't "anonymous" and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized. FTC staff will remain vigilant to ensure companies are following the law and take action when the privacy claims they make are deceptive.[42]

121. Thus, Defendants sent and the Third Parties intercepted Plaintiff and Class Members personally identifiable information regardless of whether it was hashed or plain text.

**J.      Tolling**

122. Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment of its incorporation of the Tracking Technologies onto the Website.

123. The Tracking Technologies are entirely invisible to a website visitor.

124. Through no fault or lack of diligence, Plaintiff and members of the putative classes were deceived and could not reasonably discover Defendant's deceptive and unlawful conduct.

125. Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

126. Defendants had exclusive knowledge that the Website incorporated the Tracking Technologies and yet failed to disclose to its users, including Plaintiff, that by purchasing Defendants' products through the Website, their PII and purchase information would be disclosed to TikTok and Google.

127. Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users PII and purchase information. In fact, to the present, Defendants have not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their PII and purchase information to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

---

[42] *No, hashing still doesn't make your data anonymous*, FEDERAL TRADE COMMISSION (Jul. 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

128.    Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

129.    The earliest that Plaintiff, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of the initial complaint in this matter.

## CLASS ALLEGATIONS

130.    **Class Definition:** Plaintiff brings this action individually and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

The **Nationwide Class** that Plaintiff seeks to represent is defined as:
All individuals residing in the United States who made a purchase on the website, www.toryburch.com, during the Class Period.

The **California Subclass** that Plaintiff seeks to represent is defined as:
All individuals residing in California who made a purchase on the website, www.toryburch.com, during the Class Period.

131.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

132.    The Nationwide Class and California Subclass are referred to collectively as the "Classes."

133.    Excluded from the proposed Classes are Defendants; any affiliate, parent, or subsidiary of Defendants, any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants, any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

134.    Plaintiff reserves the right to amend the definitions of the Class or Subclass and add subclasses if further information and discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

135.    **Numerosity:** Members of the Classes are so numerous that joinder of all members

would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time.  However, it is estimated that there are at least thousands of individuals in the Classes.  The identity of such membership is readily ascertainable from Defendants' records and third-parties TikTok and Google's records.

136.    **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Classes.  The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members.  Such questions include, but are not limited to, the following:

    a.  Whether Defendants' acts and practices violated the ECPA.

    b.  Whether Defendants' acts and practices violated CIPA § 631;

    c.  Whether Defendants' acts and practices violated CIPA § 632;

    d.  Whether Defendant's acts and practices violated CIPA § 638.51, *et seq.*;

    e.  Whether Defendants' acts and practices violated the privacy rights of Plaintiff and members of the California Class under the California Constitution; and

    f.  Whether Plaintiff and members of the proposed Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

137.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to TikTok.

138.    **Adequacy:** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Classes she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

139.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Classes.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and

extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
### Violation Of The Electronic Communication Privacy Act,
### 18 U.S.C. § 2511, *et seq.*
### (On Behalf of the Nationwide Class)

140.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

141.    Plaintiff brings this claim on behalf of herself and members of the Nationwide Class.

142.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

143.    The ECPA protects both the sending and the receipt of communications.

144.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

145.    The transmission of Plaintiff's sensitive and personal information to Defendants' Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

146.    The transmission of PII between Plaintiff and Class Members and Defendants' Website with which they chose to exchange communications are "transfer[s] of signs, signals,

writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

147. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

148. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

149. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

150. The following instruments constitute "devices" within the meaning of the ECPA:

    a. The computer codes and programs Defendants and TikTok used to track Plaintiff's and Class Members' communications while they were navigating the Website;

    b. The computer codes and programs Defendants and Google used to track Plaintiff's and Class Members' communications while they were navigating the Website;

    c. Plaintiff's and Class Members' browsers;

    d. Plaintiff's and Class Members' mobile devices;

    e. Defendants' and TikTok's web and ad servers;

    f. Defendants' and Google's web and ad servers;

    g. The plan that Defendants and TikTok carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website;

    h. The plan that Defendants and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website;

151.    Plaintiff's and Class Members' interactions with Defendants' website are electronic communications under the ECPA.

152.    By utilizing and embedding the tracking technologies provided by TikTok and Google on the Website, Defendants intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

153.    Specifically, Defendants intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technologies provided by TikTok and Google on their Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and sensitive and personal information to TikTok and Google.

154.    The Defendants intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding their PII, including their identities and information related to their purchase on the Website.  This confidential information is then monetized for targeted advertising purposes, among other things.

155.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to TikTok and Google through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

156.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

157.    Defendants intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy and associating the content of Plaintiff's and Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a

manner that exceeds what Defendants promised Plaintiff and Class members on its Website.

158.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  By intercepting Plaintiff's and Class Members personally identifiable communications when it expressly represented that it would not do so, Defendants invaded Plaintiff's and Class Members' privacy.

159.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiff and Class Members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendants in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of the California Subclass)**

160.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

161.    Plaintiff brings this claim against Defendants individually and on behalf of the California Subclass.

162.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630–638.  CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ."  Cal. Penal Code § 630.

163.    A person violates California Penal Code § 631(a), if:

> By means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable or instrument of

> any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

164.    Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

165.    To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

166.    At all relevant times, Defendants aided, agreed with, and conspired with TikTok and Google to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members

167.    Defendants, when aiding and assisting TikTok and Google's wiretapping and eavesdropping, intended to help TikTok and Google learn some meaning of the content in the URLs and the content the visitor requested.

168.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Technologies fall under the broad catch-all category of "any other manner":

    a.  The computer codes and programs TikTok used to track Plaintiff and Class Members' communications while they were navigating www.toryburch.com;

    b.  The computer codes and programs Google used to track Plaintiff and Class Members' communications while they were navigating www.toryburch.com;

    c.  Plaintiff's and Class Members' browsers;

    d.  Plaintiff's and Class Members' computing and mobile devices;

    e.  TikTok's web and ad servers;

---

f.  Google's web and ad servers;

g.  The web and ad-servers from which TikTok tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.toryburch.com;

h.  The web and ad-servers from which Google tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.toryburch.com;

i.  The computer codes and programs used by TikTok to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.toryburch.com;

j.  The computer codes and programs used by Google to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.toryburch.com;

k.  The plan TikTok carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to visit www.toryburch.com; and

l.  The plan Google carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to visit www.toryburch.com.

169.  The information that Defendants transmitted using Tracking Technologies constituted sensitive and confidential personally identifiable information.

170.  As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting TikTok and Google to receive its customers' confidential online communications through www.toryburch.com without their consent.

171.  As a result of the above violations, Defendants are liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered or be threatened

with, actual damages." Under the statute, Defendants are also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendants in the future.

## COUNT III
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632
### (On Behalf of the California Subclass)

172.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

173.    Plaintiff brings this claim against Defendants individually and on behalf of the California Subclass.

174.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication..

175.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

176.    The data collected on Defendants' Website constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to their personally identifiable information.

177.    Plaintiff and Class Members expected their communications to Defendants to be confined to Defendants in part, because of Defendants' consistent representations that these communications would remain confidential. Plaintiff and Class Members did not expect third parties, and specifically TikTok and Google, to secretly eavesdrop upon or record this information and their communications.

178.    The Tracking Technologies from TikTok and Google, are all electronic amplifying or recording devices for purposes of § 632.

179.    By contemporaneously intercepting and recording Plaintiff's and Class members'

confidential communications to Defendants through this technology, TikTok and Google eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

180. At no time did Plaintiff or Class Members consent to Defendants or TikTok and Google conduct, nor could they reasonably expect that their communications to Defendants would be overheard or recorded by TikTok and Google.

181. TikTok and Google utilized Plaintiff's and Class members' personally identifiable information for their own purposes, including advertising and analytics.

182. Defendants are liable for aiding and abetting violations of Section 632 by TikTok and Google.

183. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT IV**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 638.51(a)**
**(On Behalf of the California Subclass)**

184. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

185. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

186. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants.

187. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

188. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

189. The Tracking Technologies are "pen registers" because they are a "device or process" that recorded or decoded the "routing, addressing, or signaling information"—the IP address, Device Metadata, and unique user IDs—from the electronic communications transmitted by Plaintiff's and Class Members' computers or smartphones. Cal. Penal Code § 638.50(b); *see also Lesh*, 767 F. Supp. 3d at 40–42.

190. Likewise, the Tracking Technologies are "pen registers" because they are a "device or process" that is being used to ascertain the identity of visitors to Defendants' Website and are thus capturing "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

191. At all relevant times, Defendants installed the Tracking Technologies—which are pen registers—on Plaintiff's and Class Members' browsers, which allowed the Third Parties to record or decode Plaintiff's and Class Members' IP addresses and Device Metadata. The Tracking Technologies also set unique user identifiers on Plaintiff's and Class Members' browsers so the Third Parties—here, Google and Meta could deanonymize Plaintiff and Class Members and track them across multiple Website sessions and multiple websites.

192. Defendants and the Third Parties used the information collected by the Tracking Technologies to:

    a.  identity Plaintiff and Class Members and either create new profiles of them in the Third Parties' respective databases and/or to match Plaintiff and Class Members to pre-existing profiles (either in the Third Parties' own databases or with another entity's profile);

    b.  sell Plaintiff's and Class Members' information to advertisers for hyper-targeted advertising based on the information collected by the Tracking Technologies on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by the Third Parties on the Website);

    c.  actually target Plaintiff and Class Members with advertisements and serve advertisements on Plaintiff and Class Members based on the information

collected by the Third Parties on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information intercepted, collected, and disclosed by the Third Parties on the Website); and

d. deanonymize Plaintiff and Class Members and generate revenue from the sale of Plaintiff's and Class Members' information—both what is collected on the Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendants', advertisers', and Third Parties' revenue and the value of Third Parties' services.

193. The Tracking Technologies collect both contents and recording information relating to Plaintiff's and Class Members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up); *Deivaprakash*, 2025 WL 2541952, at *3; *Fregosa*, 2025 WL 2886399, at *5.

194. Plaintiff and Class Members did not provide their prior consent for Defendants' installation or use of the Tracking Technologies. Nor did Defendants obtain a court order to install or use the Tracking Technologies.

195. Pursuant to Cal. Penal Code § 637.2(a), Plaintiff and Class Members have been injured by Defendants' violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 638.51(a).

## COUNT V
### Invasion of Privacy Under California's Constitution
### (On Behalf of the California Subclass)

196. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

197. Plaintiff brings this claim against Defendants individually and on behalf of the California Subclass.

198. Plaintiff and Class Members have an interest in: (1) precluding the dissemination of their sensitive, confidential online communications; and (2) making personal decisions and/or

conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

199. At all relevant times, by using the Tracking Technologies to record and communicate their sensitive and confidential online communications, Defendants intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

200. Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and other data would remain confidential and that Defendants would not install wiretaps on www.toryburch.com.

201. Plaintiff and Class Members did not authorize Defendants to record and transmit Plaintiff's and Class Members' sensitive confidential online communications.

202. The invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and private online communications.  Moreover, it constituted an egregious breach of societal norms underlying the privacy right because Defendants promised to keep Plaintiff and Members of the California Subclass's communications confidential.

203. Accordingly, Plaintiff and members of the California Subclass seek all relief available for invasion of privacy claims under California's Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

 (a) For an order certifying the putative Nationwide Class and California Subclass defined above, naming Plaintiff as the representative of the putative Classes, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class and Subclass Members;

 (b) For an order declaring that the Defendants' conduct violates the statutes referenced herein;

 (c) For an order finding in favor of Plaintiff and the putative Classes on all counts asserted herein;

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED     39

(d)    For statutory damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For injunctive relief as pleaded or as the Court may deem proper; and

(g)    For an order awarding Plaintiff and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury for any and all issues in this action so triable of right.

Dated:  May 29, 2026                    Respectfully submitted,

                                        **BURSOR & FISHER, P.A**.

                                        By: */s/ Philip L. Fraietta*
                                            Philip L. Fraietta

                                        Philip L. Fraietta (State Bar No. 354768)
                                        50 Main Street, Suite 475
                                        White Plains, NY 10606
                                        Tel: (914) 874-0710
                                        Fax: (914) 206-3656
                                        E-Mail: pfraietta@bursor.com

                                        *Counsel for Plaintiff*